# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

State Farm Mutual Automobile Insurance Company,

     Plaintiff,

v.

Tyler Havemeier, Nikki Blank, and Jacob Gatzlaff,

     Defendants.

Case No. 18-cv-2459 ECW

**ORDER**

---

This matter is before on the Court on Cross-Motions for Summary Judgment by Plaintiff State Farm Mutual Automobile Insurance Company ("State Farm") (Dkt. 33); and Defendant Jacob Gatzlaff ("Gatzlaff"). (Dkt. 35.) The parties have consented to the jurisdiction of this Court pursuant to 28 U.S.C. § 636 and Rule 73 of the Federal Rules of Civil Procedure. (Dkts. 13, 14.) State Farm and Gatzlaff each seek a declaratory judgment in their favor with respect to State Farm's obligation to provide insurance coverage benefits related to a policy of a vehicle of its insured, Defendant Nikki Blank ("Blank"), driven by Defendant Tyler Havemeier ("Havemeier"), which hit Gatzlaff on June 27, 2016. For the reasons stated below, the Court denies the Cross-Motions for Summary Judgment.

# I.      FACTUAL BACKGROUND

**A.      June 27, 2016 Incident**

On June 27, 2016, Havemeier drove his then-girlfriend Blank's 1992 Pontiac Grand Prix, which was insured through State Farm.  (Dkt. 1 ¶ 6; Dkt. 6 ¶ 3[1]; Dkt. 41-1 at 22-26 (Havemeier Dep.).)[2]  Havemeier was accompanied by two individuals that he drove in Blank's vehicle to Outlaws Bar and Grill ("Bar") in Springfield, Minnesota. (Dkt. 41-1 at 28, 39-44, 49-51 (Havemeier Dep.).)

At the Bar, Gatzlaff offered to buy the individuals accompanying Havemeier (who were minors at the time of the events at issue)—Blank's 15-year-old son Parker Goldschmidt ("Goldschmidt") and Goldschmidt's 17-year-old friend Nicholas Goblirsch ("Goblirsch")—alcoholic drinks.  (Dkt. 41-1 at 52-53 (Havemeier Dep.); Dkt. 44-1 at 30 (Goldschmidt Dep.); Dkt. 44-2 at 40-42 (Goblirsch Dep.).)  According to Goblirsch, Gatzlaff appeared to be drunk on the basis that his speech was slurred and he was stumbling around the Bar.  (Dkt. 44-2 at 40-41 (Goblirsch Dep.).)  Havemeier rejected the drinks and engaged in a verbal altercation with Gatzlaff that continued up until the point that Havemeier left the Bar.  (Dkt. 41-1 at 54-56 (Havemeier Dep.); Dkt. 44-1 at 30 (Goldschmidt Dep.); Dkt. 44-2 at 43, 48 (Goblirsch Dep.).)

---

[1]      The Court notes that Defendants Blank and Havemeier have not answered or otherwise made an appearance in this action.

[2]      Page references with respect to deposition transcripts cited in this Order reference the page number of the transcripts and not the CM/ECF page numbers.  Unless stated otherwise, any other page references to docket entries in this Order pertain to the CM/ECF page numbers.

Havemeier testified that while he was in Blank's vehicle (while parked in the Bar's parking lot), he observed Gatzlaff leaving the Bar, coming out the north side of the building carrying two drinks.  (Dkt. 41-1 at 64-65 (Havemeier Dep.).)  Goblirsch testified that after Havemeier backed out of the parking space and started going forward, Gatzlaff briskly walked and stumbled into the middle of the parking lot and made an obscene gesture towards the vehicle.  (Dkt. 44-2 at 56-57, 60 (Goblirsch Dep.).)

According to Havemeier, he then drove the vehicle exiting the parking lot, and the vehicle made contact with Gatzlaff while exiting the parking lot.  (Dkt. 41-1 at 64-67 (Havemeier Dep.).)  According to Goblirsch, Havemeier started to accelerate when Gatzlaff made the previously mentioned obscene gesture.  (Dkt. 44-2 at 62 (Goblirsch Dep.).)  Havemeier testified that one of the passengers told him that Gatzlaff was approaching, and then he unsuccessfully attempted to swerve away from Gatzlaff, who was running toward the vehicle.  (Dkt. 41-1 at 66-67 (Havemeier Dep.).)  Havemeier further testified that although he tried to swerve away, Gatzlaff happened to hit the vehicle, causing him to roll off of the vehicle, knocking off one of the vehicle's side mirrors while he did so.  (*Id.* at 73-75.)  Goldschmidt testified that although he told police that Gatzlaff walked towards the vehicle and got hit, he claimed at his deposition that he lied to police because he was afraid of Havemeier.  (Dkt. 44-1 at 43-44 (Goldschmidt Dep.).)  Goldschmidt told police that Havemeier did not swerve at any point prior to the collision.  (Dkt. 38-1 at 21.)  Goldschmidt testified at his deposition that he could not recall whether Havemeier swerved at any point, but that he did not see the actual impact with Gatzlaff because he was on his phone at the time.  (Dkt. 44-1 at 55-56, 59, 68, 98-99

3

(Goldschmidt Dep.).)  Goldschmidt did testify that Havemeier accelerated "right away" when leaving the Bar parking lot.  (*Id.* at 41.)

Another passenger of the vehicle, Meghann Bergstrom ("Bergstrom"), told police that Gatzlaff ran towards the vehicle, and Havemeier moved a little bit to the left, but Gatzlaff kept running toward the vehicle before he was hit.  (Dkt. 38-1 at 22.)  Bergstrom acknowledged to Police she did not see Gatzlaff get hit by the vehicle hit because she was on her phone.  (*Id.* at 22.)

Gatzlaff told police that he saw a vehicle come around a parking lot, heard the acceleration and saw the vehicle swerve towards him, but did not know if Havemeier was trying to scare him.  (*Id.* at 24.)

Goblirsch testified that as they were pulling forward, he was looking down at his phone, and he felt a jolt of the vehicle towards the Bar on the side that Gatzlaff was standing, as well as saw from the corner of his eye Havemeier jerking the wheel towards the direction of Gatzlaff, felt the car accelerate, and then after three seconds felt a body hit the vehicle, bounce off the top of the vehicle, and roll off the back of the vehicle.  (Dkt. 44-2 at 58, 77-80, 87, 116, 123 (Goblirsch Dep.).)  Goblirsch acknowledged that he was looking down at his cell phone when this all occurred.  (*Id.* at 58, 104 (Goblirsch Dep.).)  Goblirsch testified that Havemeier intentionally turned the wheel towards Gatzlaff and accelerated.  (*Id.* at 87-88.)  Goblirsch also testified he felt that Havemeier intentionally meant to hit Gatzlaff.  (*Id.* at 59, 88.)

Another witness, Eric Erickson ("Erickson"), who followed Gatzlaff out of the Bar on the night in question, testified at his deposition that when he walked out of the Bar he

saw a vehicle, saw Gatzlaff raise his drink up in air, then observed the vehicle accelerate and swerve at Gatzlaff, hitting him at about 15-20 miles per hour, and then saw the vehicle drive off onto Highway 14. (Dkt. 44-3 at 35, 42-43, 47, 68, 74, 82, 97 (Erickson Dep.).) Erickson described the maneuver as like in a "game of chicken" where the driver tried to fake swerve to get Gatzlaff to jump out of the way but that the speed of the vehicle was an issue and Gatzlaff did not have enough time to get out of way. (*Id.* at 47-49, 86.) Erickson thought that Havemeier was trying to scare Gatzlaff, but testified that he did not know what the intent of the driver was at the time. (*Id.* at 61.) Erickson told police that Havemeier swerved at Gatzlaff and made sure that he hit Gatzlaff. (Dkt. 38-1 at 20; Dkt. 44-3 at 68.) Erickson did acknowledge that he was under the influence of alcohol at the time he observed Gatzlaff being struck by a vehicle. (Dkt. 44-3 at 52-53.)

Havemeier maintained that he never had his foot on the gas when he was in the parking lot of the Bar and was driving at about 5 miles per hour, although he acknowledged that he may have told the police that he may have tapped the accelerator. (Dkt. 41-1 at 70, 97 (Havemeier Dep.).) One of the passengers, Goldschmidt, guessed that Havemeier sped out of the parking lot at about 10-15 miles per hour and that it felt like he was accelerating from the moment he started driving. (Dkt. 44-1 at 38-43 (Goldschmidt Dep).) Havemeier claimed that he did not stop at all when he left, even though he wanted to, because everyone in the vehicle told him to keep going and they were all in a panic that they would get in trouble. (Dkt. 41-1 at 72 (Havemeier Dep.).) Goldschmidt does not remember anyone telling Havemeier to stop at any point. (Dkt. 44-

1 at 88 (Goldschmidt Dep).)  Goldschmidt testified that Havemeier did not hit the brakes

when he hit Gatzlaff and just kept going.  (*Id.* at 59, 70.)

Havemeier testified that he did not intend to injure Gatzlaff on June 27, 2016.

(Dkt. 41-1 at 122 (Havemeier Dep.).)

Havemeier fled the scene to his home, where the police were waiting him.  (*Id.* at

73, 76.)  Goblirsch testified that on the way back home Havemeier told the occupants of

the vehicle "don't fuck with me at a bar."  (Dkt. 42-2 at 65 (Goblirsch Dep).)

**B.     Criminal Charges and Alford Plea**

Havemeier was arrested for leaving the scene of an accident and second-degree

assault.  (Dkt. 38-1 at 24.)  Criminal charges were brought against Havemeier.  (Dkt. 31-

1.)  On December 10, 2016, Havemeier entered an *Alford* plea to Second Degree Assault,

under Minn. Stat § 609.222, subd. 2.  (*Id.*)  During the *Alford* plea proceeding, the

pending charges against Havemeier were addressed, including:

- Two counts of second-degree assault, which are felony offenses, punishable by up to ten years of incarceration and not more than a $20,000 fine.

- One count of third-degree assault, which is also a felony, punishable by up to five years of incarceration and not more than a $10,000 fine.

- One count of gross misdemeanor offense of traffic collision, failure to stop, punishable by up to one year of incarceration and not more than a $3,000 fine.

(Dkt. 31 at 4.)

With respect to pleading guilty as part of the *Alford* plea to Second Degree

Assault, Havemeier admitted as follows:

Q.     Were you in Brown County on June 27th of this year?

6

A.     Yes.

Q.     And did you visit a restaurant or bar?

A.     Yes.

Q.     What was the name of it?

A.     Outlaws Bar and Grill.

Q     Yes.  Where is that located?

A     Right when you enter Springfield.

* * *

Q     Okay.  And was there somebody in the bar that was interacting with You?

A.     More than one.

Q     Okay.  But was there a particular person with the initials of J.G.?

A     Yes.

Q     All right.  And did you after a point in time, exit the bar?

A     Yes.

Q     Did you go to your motor vehicle?

A     Yes.

Q     And did you begin to drive your motor vehicle out of the parking lot of Outlaws Bar and Grill?

A     Yes.

Q.     Did this person, J.G., come out of the bar and approach your motor vehicle while it was moving?

A.     Yes.

Q.      And did the car end up striking him?

A       Meaning he got –

Q       Well, was there some kind of contact?

A       Yes.

Q       Okay.  Now, there was a passenger in your vehicle with the initials of N.G.; is that correct?

A       Yes.

Q       N.G. said that he was in the passenger side of your vehicle; is that true?  And he was looking out the window when this happened?

A.      No, he said he was looking downward, at his phone.

Q.      But he did give a statement to the police saying that he saw well, that he saw J.G. walk out of the restaurant; is that true?

A       Yes, but then he told me he was looking downward at his phone after he saw him walk out of the bar.

Q.      But then he also told law enforcement that he felt the vehicle swerve towards J.G. and strike him; is that true?  That's what he said?  I can read it in the criminal complaint.

A       Yes, that's what he said.

Q.      That's what he said.  Okay.  So he, essentially, said that you intentionally struck him?

A.      Yes, that's what he said.

Q.      All right.  Now you have the right to a trial where we'd bring in N.G., and he'd have to testify, and we have the right to question him, but you understand that if a jury believes him and not our witnesses or you, that there would be a conviction, highly likely there would be a conviction for a second degree assault; do you understand that?

A.      Yes.

Q      So do you believe that if a jury believed N.G. and none of our witnesses, that a jury would convict you?

A      As of being guilty?

Q      Yes.

A      Yes.

Q      All right.  And you'd rather take the offer than risk a jury trial?

A.      Yes.

Q      All right.  And for that reason, are you pleading guilty today?

A      Yes.

(Dkt. 31-1 at 7-11.)  Havemeier also acknowledged that he left the scene and that the evidence showed that Gatzlaff had broken a bone as a result of the car accident.  (*Id.* at 12.)

In discussing the *Alford* plea, Brown County District Court Judge Robert A. Docherty and Havemeier had the following relevant exchange:

The Court:    Mr. Havemeier, what we're talking about with an *Alford* plea is this: It's a situation where you do not agree with the statements or the State's evidence; in fact, you dispute that, but you're willing to plead guilty in order to avoid the possibility that a jury, at trial, might convict you of something more serious than what you're pleading guilty to; do you understand that?

The Defendant:  Yes.

The Court:    And do you understand that with an *Alford* plea, it's the same as if you took the witness stand and said I intentionally drove over this guy, and I tried to hurt him, it's got the same effect; do you understand that?

The Defendant:  Yes.

THE COURT:  Okay.  In reviewing the complaint, there's a statement here from somebody whose initials are E. E.  E. E. said he saw what happened. He said that you and J.G. got into some sort of argument in the bar.  J.G. went outside when you left.  E.E. tried to hold J.G. back, and E.E. said he saw the car pull forward to leave the parking lot but then swerved at J.G.  E.E. said, "The dude f-ing swerved at him.  The dude turned to make sure he hit him." Do you agree that if E.E. were called as a witness at trial and testified to that and a jury believed what he said and disbelieved what you and your witnesses said, the jury would likely convict you or find you guilty of the assault ?

* * *

THE DEFENDANT:  Yes.

(*Id.* at 12-14.)

The court then accepted the plea and sentenced Havemeier.  As part of the *Alford* plea, Havemeier acknowledged that as a result of accepting the plea related to the felony count, he would face certain collateral consequences, such as being unable to own a firearm.  (*Id.* at 8.)

## C.    State Civil Action Against Havemeier

On or about June 1, 2018, Gatzlaff commenced a lawsuit entitled "*Jacob Gatzlaff v. Tyler Douglas Havemeie*r" in Brown County District Court (hereinafter the "State Action") in which Gatzlaff alleges that Havemeier is liable to him for damages resulting from injuries sustained in the June 27, 2016 incident.  (Dkt. 1 ¶ 13; Dkt. 6 ¶ 7.)  The State Action was tendered to State Farm to provide defense and indemnity to Havemeier.  (Dkt. 1 ¶ 14; Dkt. 6 ¶ 7.)

## D.    Insurance Policy

State Farm asserts that Havemeier intentionally swerved the vehicle toward Gatzlaff and intentionally caused the vehicle to strike Gatzlaff, resulting in injuries, and

thereby seeks a declaratory judgement from this Court that it has no duty to defend and indemnify Havemeier in the State Action because of the insurance policy's exclusions for an insured who intentionally causes bodily injury. (Dkt. 1 at 3-4.) The policy at issue ("Policy") states "[*w*]*e* will pay: a. damages an ***insured*** becomes legally liable to pay because of: (1) ***bodily injury.***" (Dkt. 31-2 at 13 (emphasis in original).) The parties agree that Havemeier fits in the definition of "insured" and Gatzlaff suffered bodily injury. (Dkt. 32 at 4.)

The Policy also contains the following exclusion: "THERE IS NO COVERAGE FOR AN ***INSURED***: 1. WHO INTENTIONALLY CAUSES ***BODILY INJURY*** OR DAMAGE TO PROPERTY." (Dkt. 31-2 at 15 (emphasis in original).)

## II.    <u>LEGAL STANDARD</u>

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). As this wording suggests, the initial burden of showing that no genuine issue of material fact exists lies with the movant. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A factual dispute is "material" only if resolving it might affect a suit's outcome under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Furthermore, a factual dispute is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"). When assessing a summary

judgment motion, a court should believe the nonmovant's evidence and draw all justifiable inferences in the nonmovant's favor. *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)).

## III.   ANALYSIS

State Farm does not dispute that Havemeier is covered under the Policy, that Gatzlaff was injured on June 27, 2016, or that Havemeier is liable to Gatzlaff for causing those injuries. (Dkt. 32 at 10.) State Farm argues that Havemeier's claim for coverage is excluded from coverage under the plain terms of the Policy because he operated the vehicle with the intent to cause Gatzlaff bodily injury. (*Id.* at 8-10.) According to State Farm, that issue is conclusively resolved by the factual bases for Havemeier's *Alford* plea to Second Degree Assault under section 609.222, subdivision 2, and the Brown County Court's acceptance of that plea. (*Id.* at 10.)

Gatzlaff argues to the contrary. Not only does Gatzlaff argue that the *Alford* plea does not conclusively resolve Havemeier's intent (Dkt. 40 at 6-7), but Gatzlaff asserts as part of his motion for summary judgment that the Court should enter declaratory judgment in his favor (rather than State Farm's), as there exists no evidence proving Havemeier acted with the intention to strike and injure Gatzlaff. (Dkt. 37 at 7-9.)

The Court will proceed with analyzing the parties' respective motions.

## A.   State Farm's Motion for Summary Judgment

State Farm presents its motion for summary judgment based on the vehicle's insurance policy. As stated previously, the Policy states in relevant part: "[t]here is no coverage for an insured: 1. Who *intentionally* causes bodily injury . . . ." (Dkt. 31-2 at

15.)  As noted, in the aftermath of the incident with Gatzlaff, Havemeier submitted to an

*Alford* plea for second degree assault under Minn. Stat § 609.222, subd. 2.[3]  (Dkt. 31-1.)

An *Alford* plea is a type of guilty plea containing a protestation of innocence when

a defendant concludes that his interests require entry of a guilty plea and the record

before the judge contains evidence of actual guilt.  *See North Carolina v. Alford*, 400

U.S. 25, 37-38 (1970).  The Minnesota Supreme Court implemented the *Alford* plea in

*State v. Goulette*, 258 N.W.2d 758 (1977), stating that it is "absolutely crucial that when

an *Alford*-type plea is offered the trial court should not cavalierly accept the plea but

should assume its responsibility to determine . . . whether there is a sufficient factual

basis to support it."  258 N.W.2d at 761 (citation omitted).

State Farm argues that an *Alford* plea is the same as a conventional guilty plea and

carries the same collateral consequences as a guilty plea.  (Dkt. 32 at 12.)  According to

State Farm, by accepting Havemeier's plea, the Brown County District Court essentially

litigated the issue of intent, as the court conclusively determined that Havemeier operated

the vehicle with intent to cause Gatzlaff bodily injury.  (*Id.* at 13-14.)  However, in the

State of Minnesota, an *Alford* plea does not always have the same collateral effect as a

traditional guilty plea.

---

[3]     In Minnesota, "Assault" is defined as both "(1) an act done with intent to cause
fear in another of immediate bodily harm or death; or (2) the intentional infliction of or
attempt to inflict bodily harm upon another."  Minn. Stat. § 609.02, subd. 10.  However,
it is evident from the *Alford* plea transcript that the court accepted the plea in accordance
to the second definition.  (*See* Dkt. 31-1.)  Specifically, the court mentioned that each
witness described Havemeier's attempt to injure Gatzlaff, as opposed to cause fear of
immediate bodily harm or death.  (*See*, *e.g.*, *id.* at 10, 13-14.)

The collateral consequences of an *Alford* plea in a civil trial was a matter of first impression for the Minnesota Supreme Court[4] in *Doe 136 v. Liebsch*, 872 N.W.2d 875 (Minn. 2015). The Minnesota Supreme Court's analysis focused on the balance between the probative value of the *Alford* plea and the prejudicial risk in terms of its admission into evidence at trial. *Id.* at 881-82. Whereas a "conventional guilty plea, by contrast, requires a defendant to admit the conduct to which he or she is accused of committing," the underlying trial court in *Liebsh* concluded "that the only real admission by Liebsch is that a **jury might find him guilty** if it chose to find credible the testimony of witnesses which was never presented to it." *Id.* at 881 (cleaned up) (citation omitted) (emphasis added). The Minnesota Supreme Court held that the trial court did not abuse its discretion by excluding the *Alford* plea from evidence. *Id.* at 882. The court reasoned that "Liebsh's *Alford* plea **included no admission of facts establishing guilt**, and therefore it lacked the probative value typically found in a conventional guilty plea." *Id.* (emphasis added). Thus, the Minnesota Supreme Court would not always view nor treat an *Alford* plea as it would a conventional guilty plea. Other courts from outside Minnesota have held similarly with respect to the effect of an *Alford* plea. *See*, *e.g.*, *Barker v. Ameriprise Auto & Home Ins. Agency, Inc.*, 905 F. Supp. 2d 1214, 1219 (W.D. Wash. 2012) ("Acknowledgement of the *existence* of evidence is not an admission as to

---

[4]   When a case appears in federal court under diversity jurisdiction, the court must apply the relevant state law. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 80 (1938). In doing so, the court is bound by the interpretation of the state's law by the state's Supreme Court. *See Lindsay Mfg. Co. v. Hartford Acc. & Indem. Co.*, 118 F.3d 1263, 1267 (8th Cir. 1997).

the *truth* of that evidence."); *Fleck v. State Farm Ins. Cos.*, No. 89-L-14-070,1990 WL 124648 at \*2 (Ohio Ct. App. Aug. 24, 1990) ("Such a plea does not constitute an admission of guilty, but rather that the accused is willing to waive a trial and accept the consequences of the plea. It, however, does not act as an admission of the plea . . . [t]herefore, appellant's guilty plea, by way of a qualified *Alford* plea, operates in the same fashion as a *nolo contendere* plea for the purposes in a subsequent civil action.").

The instant issue is similar to that addressed by the Minnesota Court of Appeals in *Johnson v. West Bend Mutual Insurance Co.*, A17-1957, 2018 WL 6596270 (Minn. Ct. App. 2018). *Johnson* involved an insurance company seeking summary judgment with respect to an insurance policy covering an in-home daycare, arguing that an injury to a child ("D.J.") was excluded under the policy's criminal-act exclusion based on an *Alford* plea for gross misdemeanor child neglect by the day-care provider Jewel Plocienik ("Plocienik"). *Id.* at \*1-2. While the *Alford* plea was admitted into evidence, the Minnesota Court of Appeals of Minnesota overturned summary judgment for the insurance company. *Id.* at \*2. The court stated that "[d]uring her plea colloquy Plocienik denied harming D.J., acknowledging only that the state's evidence would be sufficient to convict her." *Id.* at \*8. The Court reasoned that the *Alford* plea showed that the child's injuries led to a criminal conviction but not that the injuries arose from a criminal act. *Id.* at \*9 ("Without a clearer admission of her conduct or of her guilt, or additional evidence from some other source, Plocienik's equivocal plea statements leave open the possibility that D.J. was injured by negligent supervision that did not amount to a criminal act or involve a statutory violation.").

15

In this case, the record and transcript of Havemeier's *Alford* plea must be assessed to determine what Havemeier definitively admitted to during the proceeding.  During the course of his plea, Havemeier admitted to visiting the Bar, making "some kind of contact" against Gatzlaff with his car, and driving away.  (Dkt. 31-1 at 9, 10, 13.)  However, Havemeier himself never admitted to intentionally striking Gatzlaff.  Like in *Johnson*, Havemeier only admitted that if the jury did not believe him or any of his witnesses and believed Goblirsch and Erickson's testimony of the events at issue that a jury would be likely to find him guilty.  (*Id.* at 11-12, 14-15.)  There was no assertion in the plea that he agreed to the witnesses' characterization of the events.

During the proceeding, Havemeier agreed to several statements made by the Court that convolute his plea.  The transcript shows the following exchange:

> The Court:    Mr. Havemeier, what we're talking about with an *Alford* plea is this: It's a situation **where you do not agree with the statements or the State's evidence; in fact, you dispute that, but you're willing to plead guilty in order to avoid the possibility that a jury, at trial, might convict you of something more serious** than what you're pleading guilty to; do you understand that?
>
> The Defendant:  Yes.
>
> The Court:    And do you understand that with an *Alford* plea, it's the same as if you took the witness stand and said I intentionally drove over this guy, and I tried to hurt him, it's got the same effect; do you understand that?
>
> The Defendant:  Yes.

(*Id.* at 13-14 (emphasis added.))

In the course of this one exchange, Havemeier both asserted his innocence, disputed the evidence against him, and appeared to accept that his plea would have the

16

same effect as him stating on the stand that he intentionally acted to injure Gatzlaff.[5]

Because of the conflicting transcript, Havemeier's *Alford* plea cannot establish that State

Farm has met its initial burden to show the absence of genuine issues of material fact as

to whether Gatzlaff's injury arose from an intentional act.  The summary judgment record

might establish as a matter of law that Gatzlaff's injuries resulted in a criminal

conviction, but not that Havemeier intended to harm Gatzlaff.

    In addition to relying on the *Alford* plea, State Farm argues that collateral estoppel

should prevent re-litigation of Havemeier's intent.  (Dkt. 32 at 15-16.).)

    Collateral estoppel may be applied when:

    (1) the issue was identical to one in prior adjudication; (2) there was a final
    judgment on the merits; (3) the estopped party was a party or in privity with
    a party to the prior adjudication; and (4) the estopped party was given a full
    and fair opportunity to be heard on the adjudicated issue.

*State v. Lemmer*, 736 N.W.2d 650, 659 (Minn. 2007) (citation omitted) (quoting *Willems*

*v. Comm'r of Pub. Safety*, 333 N.W.2d 619, 621 (Minn. 1983)).  Additionally, collateral

estoppel is flexible and should not be applied when its application would "work an

injustice on the party to be estopped."  *Id*.  Regardless of whether the issue of intent is the

same with respect to a criminal charge and its definition within an insurance policy, the

remainder of the elements for the application of collateral estoppel are lacking.  While

---

[5]    The Court also notes that while it is not entirely clear, it appears that the state
court was only explaining that the *Alford* plea would have the same effect as if
Havemeier admitted that he intentionally stuck Gatzlaff.  Indeed, "[a] conviction based
upon an *Alford* plea generally carries the same penalties and collateral consequences as a
conventional guilty plea."  *Liebsch*, 872 N.W.2d at 880.

Havemeier was a party to his prior criminal proceeding and he was given an opportunity to litigate the issue of intent, Gatzlaff did not have this same opportunity.

Further, the second element is lacking. In the context of an *Alford* plea, the Minnesota Supreme Court has not directly addressed collateral estoppel. The Minnesota Supreme Court in *Liebsch* did not review the district court's conclusion that collateral estoppel did not apply because the plaintiffs did not appeal the decision. *See* 872 N.W.2d at 878 n.2. In *Johnson*, the court specifically declined to address the argument because it was first raised on appeal. 2018 WL 6596270 at *8. However, the analyses in *Liebsch* and *Johnson* show how the Minnesota Supreme Court would decide the legal question.

Revisiting *Liebsch*, the Minnesota Supreme Court analyzed Liebsch's *Alford* plea to determine the elements that were admitted. 872 N.W.2d at 883. This line of analysis would mean that, in an *Alford* context, the court does not view pleading to a charge to be the same as pleading to each element of that charge. Furthering this logic, the court in *Johnson* (involving a child abuse charge) states that the *Alford* plea only shows that the child's injuries "resulted in a criminal conviction. . . . Without a clearer admission of her conduct or of her guilt, or additional evidence from some other source, Plocienik's equivocal plea statements leave open the possibility that D.J. was injured by negligent supervision that did not amount to a criminal act or involve a statutory violation." 2018 WL 6596270 at *9. This analysis shows that, unless the element is explicitly admitted, elements of the subject of an *Alford* plea are not considered fully litigated and therefore not collaterally estopped.

Additionally, the Minnesota Supreme Court affirmed the trial court's decision to exclude Liebsch's *Alford* plea even as impeachment evidence. *Liebsch*, 872 N.W.2d at 883. The trial court concluded that the plea's potential prejudice to Leibsch outweighed its probative value. *Id.* at 881. If the court did view an *Alford* plea as encompassing each element for purposes of collateral estoppel, there would not have been any prejudicial risk from admitting it for impeachment purposes because the plea would have eliminated the inquiry associated with the *Alford* plea. Evidence that would eliminate the jury's need to find facts as to an element could not confuse or distract the jury. Therefore, because the Minnesota Supreme Court does not view an *Alford* plea as encompassing each element of the charge, it cannot view an element as fully litigated if it was not admitted during the course of the plea.

More importantly, the Minnesota Supreme Court found in *Illinois Farmers Insurance Co. v. Reed*, 662 N.W.2d 529 (Minn. 2003), that an insured's criminal conviction (outside of convictions where the defendant sought to profit from their crime) cannot be used an insurance company to collaterally estop the victim of the crime from litigating in a subsequent civil action the issue of the insured's intent to determine whether the insured's homeowner's insurance policy provides coverage for an incident. In *Reed*, the appellants' young child was injured after his babysitter, Reed, violently shook him. *See* 662 N.W.2d at 530. Reed was convicted as a part of a bench trial of felony first-degree assault and felony malicious punishment of a child for her actions. *Id.* In a subsequent civil action, Reed's insurer refused to indemnify her based on the policy's intentional-act exclusion. *Id.* at 531. Reed's insurer claimed that Reed's

19

criminal convictions collaterally estopped the appellants from relitigating the issue of whether Reed intended to injure their child.  *Id.* at 533.  However, the Minnesota Supreme Court rejected this argument, holding that "an insurer may not use an insured's criminal conviction to collaterally estop a subsequent civil suit brought by a third-party crime victim based on the intentional act exclusion within the policy."  *Id.* at 534.  In rendering this holding, the court found it important that the victim did not have the chance to present their case as part of the criminal prosecution, as the only parties were the state and Reed.  *Id.* at 533.  Similarly, in this case the only parties to the plea as part of the criminal action were the State and Havemeier, and Gatzlaff obviously did not have any opportunity to present his case or otherwise be heard.  Ultimately, the Court finds that if collateral estoppel cannot apply to a criminal conviction as part of trial, then *a fortiori,* it cannot apply to an *Alford* plea where Havemeier pleaded guilty to avoid possible harsher penalties.

For the preceding reasons, summary judgment in this instance would be inappropriate based solely on the *Alford* plea or collateral estoppel, and State Farm's motion is therefore denied.

**B.    Gatzlaff's Motion for Summary Judgment**

Gatzlaff argues that not only should the Court deny State Farm's motion for summary judgment, but instead the Court should grant declaratory relief in his favor, as there exists no evidence proving Havemeier acted with the intention to strike and injure Gatzlaff.  According to Gatzlaff, there is no evidence that Havemeier's actions were anything other than negligent or careless.  In particular, Gatzlaff argues that, despite the

fact that he was hit by Havemeier driving a vehicle after a verbal altercation, he is entitled to summary judgment as it relates to coverage because the vast majority of the deposition testimony, including that of Havemeier, demonstrates that Havemeier did not intend to hit or hurt Gatzlaff on June 26, 2016.  (Dkt. 37 at 6.)  Gatzlaff also argued that intent cannot be inferred as a matter of law because the actions at issue constitute impulsive actions and Erickson testified at his deposition that be believed Havemeier was playing chicken and was trying to scare Gatzlaff, but that Gatzlaff was unable to move out of the way and Havemeier was too slow to straighten the vehicle.  (*Id.* at 7.)  Gatzlaff also relies on the testimony of the other witnesses and asserts that they could not testify as to any certainty regarding Havemeier's intent.  (*Id.* at 9.)

State Farm counters that Havemeier's intent to injure Gatzlaff should be inferred as a matter of law because he should have known that Gatzlaff would be injured when he deliberately drove his vehicle at and struck Gatzlaff and that Havemeier did so after being removed from the altercation with him inside the Bar.[6]  (Dkt. 43 at 10-11.)  State Farm compares this conduct with that of the defendant's in *Smith v. Senst*, 313 N.W.2d 202, 203 (Minn. 1981).  (Dkt. 43 at 10-11.)  In *Senst*, the court inferred intent to injure as a matter of law because the defendant voluntarily entered a dispute between a bartender

---

[6]    The Court notes that State Farm did not move on this basis as part of its Motion for Summary Judgment.  That said, a "district court maintains the discretion to grant a non-moving party summary judgment, even where the nonmovant does not file a cross-motion for summary judgment."  *Acton v. City of Columbia, Mo.*, 436 F.3d 969, 975 n.5 (8th Cir. 2006) (citing *Burlington N. R.R. Co. v. Omaha Pub. Power Dist.*, 888 F.2d 1228, 1231 n.3 (8th Cir. 1989)).

and the defendant's friend and, after the plaintiff (a bar patron) pulled the defendant off

the bartender and pushed him away from the scuffle, the defendant punched the plaintiff.

313 N.W.2d at 203.

According to State Farm, it is undisputed that Havemeier accelerated, steered his

vehicle to the right towards Gatzlaff, but did not steer the vehicle back to the left, away

from Gatzlaff, until after the vehicle struck Gatzlaff.  (Dkt. 43 at 10-13.)  Relying on

*Senst*, State Farm argues that the Court can infer that Havemeier's "extreme driving

conduct" was not spontaneous, reflexive, or meant to protect himself because

Havemeier's conduct occurred after he had left the Bar.  (*Id.* at 10-15.)  Moreover, State

Farm contends that, notwithstanding Erickson's deposition testimony that Havemeier

drove at Gatzlaff as if he were playing a game of "chicken" or as a scare tactic, the

incident could not fall into the realm of a mere game because Havemeier was driving too

fast (without any braking) and was too close to Gatzlaff.  (*Id.* at 15-16.)  In other words, it

is State Farm's position that intent to injure can be inferred because Havemeier should

have known that a harm was substantially certain to result from his conduct.  (*Id.* at 15-

16.)

Under Minnesota law, policy exclusions from insurance coverage "are construed

narrowly and strictly against the insurer and, like coverage, in accordance with the

expectations of the insured."  *Travelers Indem. Co. v. Bloomington Steel & Supply Co.*,

718 N.W.2d 888, 894 (Minn. 2006) (citations omitted); *see also Westfield Ins. Co. v.*

*Robinson Outdoors, Inc.*, 700 F.3d 1172, 1174 (8th Cir. 2012) (citation omitted)

(applying Minnesota law).

22

The Minnesota Supreme Court has determined that, for purposes of the intentional-act exclusion found in most liability insurance policies, conduct is intentional only when there is specific intent to cause injury. *See Am. Family Ins. Co. v. Walser*, 628 N.W.2d 605, 613 (Minn. 2001). However, a court may, absent evidence of specific intent to injure, infer intent to injure as a matter of law, based on the circumstances and nature of the insured's actions. *Id.* (citation omitted); *see also Iowa Kemper Ins. Co. v. Stone*, 269 N.W.2d 885, 887 (Minn. 1978) (citations omitted) (stating intent may be established by proof of actual intent to injure or when character of act is such that intent to inflict injury can be inferred). Such an inference of intent may occur "when the insured acted in a calculated and remorseless manner **or** when the insured's actions were such that the insured knew or should have known that a harm was substantially certain to result from the insured's conduct." *Walser*, 628 N.W.2d at 613 (emphasis added); *see also B.M.B. v. State Farm Fire & Cas. Co.*, 664 N.W.2d 817, 822 (Minn. 2003) (quotation marks and citation omitted) ("The general rule is that intent is inferred as a matter of law when the nature and circumstances of the insured's act are such that harm is substantially certain to result.") (cleaned up). "The mere fact that the harm was a 'natural and probable consequence' of the insured's actions is not enough to infer intent to injure." *Walser*, 628 N.W.2d at 613 (quoting *Cont'l Western Ins. Co. v. Toal*, 244 N.W.2d 121, 124 (1976)). "[T]he purpose of intentional act exclusions is to exclude insurance coverage for wanton and malicious acts by an insured." *Id.* There is no bright line rule as to when a court should infer intent to injure as a matter of law; rather, the **determination is made**

through a "case by case factual inquiry." *Id.* (quoting *R.W. v. T.F.*, 528 N.W.2d 869, 873 (Minn. 1995)) (emphasis added).

In *Walser*, the Minnesota Supreme Court held, as a matter of law, that intent to injure could not be inferred when a group of teenagers engaged in "horseplay" during which they pulled at a friend's legs while he was hanging on a basketball hoop rim, causing him to let go of the rim, which resulted in his injury. *See* 628 N.W.2d at 614-15. The court noted that the cases in which it had inferred intent to injure were factually more extreme than those presented in that case—the assailants were teenage boys "goofing around" and they themselves had hung on the rim and fallen without being injured in the past. *Id.* at 614. The Minnesota Supreme Court characterized the acts as impulsive, as opposed to deliberate. *Id.* at 615.

The Minnesota Supreme Court as part of its decision in *Walser* addressed a number of other fact patterns where the court found that intent to injure had not been inferred, including: when an insured struck a baggage clerk after an argument and tug-of-war over a piece of luggage; when an insured pushed a hat-check girl, causing her to be injured; or when a teenager injured a friend while exploding a device that he had exploded before without causing injuries and the insured had thrown the device away from bystanders. *Id.* at 613-14 (citations omitted). The Minnesota Supreme Court also addressed cases where intent to injure had been inferred, including: when an insured drove to a construction site armed with a high-powered rifle loaded with armor-piercing bullets and fired at a truck that he knew was occupied, and when an insured armed himself with loaded weapons to facilitate a robbery. *Id.* at 614 (citations omitted).

24

In subsequent cases examining *Walser*, courts have not inferred intent to injure in situations involving horseplay or where the injuries were not foreseeable (and the conduct was not extreme), such as where a boy caused a friend to trip or fall as part of horseplay in shop class or where a daughter threw a refrigerator magnet at her father in anger as part of an argument. *See, e.g.*, *RAM Mut. Ins. Co. v. Meyer*, 768 N.W.2d 399, 402-06 (Minn. Ct. App. 2009); *Grinnell Mut. Reinsurance Co. v. Ehmke*, 664 N.W.2d 409, 411-13 (Minn. Ct. App. 2003).

Cases where intent to injure has been inferred by courts as a matter of law dealt with fact patterns dealing with more dangerous instrumentalities of harm that are well known to the public, such as giving someone methamphetamine, even though there was not intent to kill; brandishing a dangerous weapon against an unarmed individual even if it was only meant to scare someone away; and punching someone during an argument. *See, e.g.*, *State Farm Fire & Cas. Co. v. Schwich*, 749 N.W.2d 108, 113 (Minn. Ct. App. 2008) ("We hold that when an insured has knowingly provided an injured party with methamphetamine, by preparing a syringe and encouraging the injured party to inject the drug, intent to injure is inferred as a matter of law, and therefore coverage under the policy is excluded."); *Illinois Farmers Ins. Co. v. Anderson*, No. A05-2400, 2006 WL 2348520, at *5 (Minn. Ct. App. Aug. 15, 2006) ("By creating such an inherently dangerous situation, Robert orchestrated circumstances similar to the cases where the court has inferred intent to injure."); *Illinois Farmers Ins. Co. v. Klinkhamer*, No. C9-01-1856, 2002 WL 858996, at *2 (Minn. Ct. App. May 7, 2002) (citing *Haarstad v. Graff*, 517 N.W.2d 582, 583, 585 (Minn. 1994) (stating that intent to injure existed when

insured crossed room and punched person several times in the face, breaking his jaw))
(finding that the "person who struck Faber as part of an argument acted in a calculated
and remorseless manner in circumstances that do not support a finding that the act was
more in the nature of an instinctive reflex or a sudden impulsive defensive reaction to a
provocative situation") (quotation marks and citation omitted); *Farmers Ins. Group v.
Hastings*, 366 N.W.2d 293, 293-94 (Minn. 1985) (stating that intent to injure existed
when insured suddenly and spontaneously struck friend in face "just to shut him up")).
An earlier decision by the Minnesota Supreme Court, *Senst*, relied upon by State Farm,
dealt with a confrontation between a group of bar patrons and a bartender.  A scuffle
broke out between the bartender and a member of the group over a pipe containing
hashish or marijuana.  *See Senst*, 313 N.W.2d at 203.  Senst voluntarily entered the
scuffle and grabbed the bartender to pull him away from the group member.  *Id.*  Smith,
an onlooker until that point, came to the aid of the bartender by pulling Senst off the
bartender and pushing him away from the scuffle.  *Id.*  Senst then returned to where
Smith was standing and punched him, breaking his jaw.  *Id.*  The Minnesota Supreme
Court, in ruling that Senst's act of striking Smith was intentional as a matter of law,
noted:

> Prior to hitting Smith, Senst was completely removed from the scuffle.  His
> act of striking Smith was unnecessary to protect himself and lacked the
> spontaneity inherent in a reflex action.

*Id.* at 203-04.

After a review of the record and in consideration of the parties' respective
arguments, the Court concludes that issues of material fact remain with respect to

26

Havemeier's intent that preclude summary judgment in either Gatzlaff's or Havemeier's favor. The witness accounts of what transpired outside of the Bar after the verbal argument between Havemeier and Gatzlaff vary widely. On the one hand, Goblirsch testified that he saw Gatzlaff briskly walk towards their vehicle and make an obscene gesture towards the vehicle, after which he felt and saw out of the corner of his eye Havemeier jerk the wheel of the vehicle towards Gatzlaff and accelerate the vehicle before hitting Gatzlaff. (Dkt. 44-2 at 56-63 (Goblirsch Dep.).) According to Goblirsch, he felt that at the time of the incident that Havemeier intentionally tried to hit Gatzlaff. (*Id.* at 59.) In addition, Gatzlaff told police that he saw a vehicle come around a parking lot, heard the acceleration, and saw the vehicle swerve towards him. (Dkt. 38-1 at 24.) This account was also somewhat consistent with Erickson's testimony (who was admittedly under the influence of alcohol at the time of events at issue) that he observed Gatzlaff leave the bar and raise up his glass towards the vehicle, and observed the vehicle accelerate and swerve at Gatzlaff, hitting him at 15-20 miles per hour. (Dkt. 44-3 at 35, 42-43, 47, 68, 74, 82, 97 (Erickson Dep.).) While Erickson testified that the situation was like a "game of chicken," he also noted that Havemeier was going too fast for Gatzlaff to get out of the way. (*Id.* at 47-49, 86.)

On the other hand, Havemeier testified that he attempted to swerve away from Gatzlaff, who was running toward the vehicle, to no avail. (Dkt. 41-1 at 66-67, 73-75 (Havemeier Dep.).) Further, Goldschmidt told police that Havemeier did not swerve at any point prior to the collision (Dkt. 38-1 at 21); and Bergstrom told police that Gatzlaff

ran towards the vehicle, Havemeier moved a little bit to the left, but the individual kept running toward the vehicle before he was hit (Dkt. 38-1 at 22).

To the extent that the accounts of Goblirsch, Gatzlaff, and Erickson are accurate, there is an argument that intent to injure could be inferred as a matter of law. In this case, the instrumentality of Gatzlaff's purported injuries was a motor vehicle. Courts have concluded that "[a] car is an inherently dangerous instrument." *Am. Family Mut. Ins. Co. v. C.C. by & through Clobes*, No. CV 18-2342 (DWF/ECW), 2020 WL 2319853, at *5 (D. Minn. May 11, 2020) (citing *Brown v. Am. Nat. Prop. & Cas. Co.*, Civ. No. A08-1208, 2009 WL 1119166, at *3 (Minn. Ct. App. Apr. 28, 2009)). This is not a situation, such as in *Walser*, that could be characterized as horseplay where serious injuries are not foreseeable. Swerving a vehicle at an unarmed person while accelerating, even if it was to make him jump out of the way, is more akin to wanton conduct such as brandishing a knife at an unarmed individual as in *Anderson*, *supra*. Under such facts, a trier of fact could conclude that an insured knew "someone might well be injured or killed" and that the acts were "of such a calculated and remorseless character" that intent to injure should be inferred as a matter of law. *See Walser*, 628 N.W.2d at 614 (citation omitted).

The Court acknowledges, however, that at least one court has concluded that **no** intent to injure could be inferred as a matter of law where a driver accelerated and swerved at teenagers, hitting one of them. *See State Farm Mut. Auto. Ins. Co. v. Rasmussen*, No. C6-01-440, 2001 WL 1530647, at *3 (Minn. Ct. App. Dec. 4, 2001). But when the *Rasmussen* court declined to infer intent to injure, it noted that the driver felt threatened by the teenagers who had been yelling at him earlier in the dark of the

28

morning, and that when he saw them again, he was afraid of what would happen,
resulting in swerving and accelerating towards the individuals.  *Id.* at *1.  A witness in
that case testified that after the driver collided into one of the teenagers, he heard brakes
squealing, and Rasmussen appeared to be shocked and stunned by the collision.  *Id.*  The
*Rasmussen* court went on to find as follows:

> The district court found that it was dark in the early morning hours when the
> collision occurred, Rasmussen was shocked by the collision, and he had no
> intent to collide with or injure anyone.  This example is not like a robbery
> that was "well planned," when the insured knew "someone might well be
> injured or killed" and when the acts were "of such a calculated and
> remorseless character" that intent to injure should be inferred as a matter of
> law.  *Walser*, 628 N.W.2d at 614 (citation omitted).  To the contrary, the act
> here was unplanned and impulsive, arising out of fear rather than calculation.
> Under the circumstances presented here, there was no intent to injure as a
> matter of law.

*Id.* at *3.

But here, if the trier of fact were to believe Goblirsch, Gatzlaff, and Erickson,
there is no evidence of similar fear attributable to Havemeier.  Instead, Havemeier's
actions were more akin to the barroom fight in *Senst, supra*, as is evidence by Goblirsch's
deposition testimony that after the incident Havemeier told the passengers of the vehicle
"don't fuck with me at a bar."  (Dkt. 42-2 at 65 (Goblirsch Dep.).)

That said, Havemeier's and Bergstrom's version of the facts is that Gatzlaff came
at the vehicle and Havemeier tried to swerve out of the way.  (Dkt. 41-1 at 66-67, 73-75
(Havemeier Dep.); Dkt. 38-1 at 22.)  If a trier of fact believed this version, they may not
be able to infer that Havemeier intended to harm Gatzlaff.  Given that there is a large
range of disputes of material facts, as well as issues of witness credibility, and the

determination is dependent on a case-by-case factual inquiry, the Court cannot infer

based on this record whether Havemeier intended to injure Gatzlaff as a matter of law.

*See Clobes*, 2020 WL 2319853, at *5; *see also Leonetti's Frozen Foods, Inc. v. Rew*

*Mktg., Inc.*, 887 F.3d 438, 442 (8th Cir. 2018) (quoting *Quick v. Donaldson Co.*, 90 F.3d

1372, 1376-77 (8th Cir. 1996)) (finding that when ruling on a motion for summary

judgment, "a court 'should not weigh the evidence, make credibility determinations, or

attempt to determine the truth of the matter'"). For these reasons, the Court denies

Gatzlaff's motion for summary judgment, and to the extent State Farm contends the

Court can infer Havemeier's intent to injure as a matter of law, declines to do so based on

this record.

## IV.   ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS**

**OREDERED** that:

1.     Plaintiff State Farm's Motion for Summary Judgment (Dkt. 33) is

**DENIED**; and

2.     Defendant Jacob Gatzlaff's Motion for Summary Judgment (Dkt. 35) is

**DENIED**.


DATED: September 11, 2020                    *s/Elizabeth Cowan Wright*
                                             ELIZABETH COWAN WRIGHT
                                             United States Magistrate Judge